ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EPIFANIO VIDAL, S.E.<br><br>Apelante<br><br>v.<br><br>NORMARYS FELICIANO HERNÁNDEZ; GIBRAN FELICIANO LANDRAU<br><br>Apelados | KLAN202400894 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: BY2022CV02661<br><br>Sobre: Incumplimiento contractual y cobro de dinero |

Panel integrado por su presidente, el Juez Roberto Sánchez Ramos, el Juez Rodríguez Flores y el Juez Sánchez Báez[1]

Sánchez Báez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de junio de 2026.

Compareció Epifanio Vidal, S.E. (en adelante, "demandante" o "apelante") mediante el recurso de apelación de epígrafe. Nos solicitó la revocación de la *Sentencia* emitida el 16 de agostos de 2024, notificada el 19 de agosto de 2024, por el Tribunal de Primera Instancia, Sala Superior de Bayamón (en adelante, "foro de instancia"). En el aludido dictamen, el foro de instancia declaró no ha lugar la *Demanda* y ha lugar la *Reconvención* en lo que concierne al cobro de lo indebido. Además, le ordenó al demandante devolver la cantidad de $20,220.00 cobrados en exceso, el pago de costas y honorarios por temeridad.

Por los fundamentos que expondremos a continuación, se **modifica** la *Sentencia* apelada para dejar sin efecto las determinaciones relacionadas a las **facturas núm. 12210, 12998, 13045** y **13080**, así como la imposición de costas y honorarios de

---

[1] Mediante la Orden Administrativa OATA-2025-002 emitida el 9 de enero de 2025 se designó al Juez Isaías Sánchez Báez en sustitución del Juez Ángel R. Pagán Ocasio.

Número Identificador

SEN2026_____

abogados. Así modificada, se **confirma** el resto de la *Sentencia* apelada.

**-I-**

El demandante instó *Demanda*[2] sobre incumplimiento contractual y cobro de dinero por arrendamiento comercial contra la Sra. Normarys Feliciano Hernández (en adelante, "señora Feliciano Hernández") y el Sr. Gibrán Feliciano Landrau (en adelante, "señor Feliciano Landrau") (en conjunto, "demandados" o "apelados"). Alegó que suscribió un contrato de arrendamiento con estos últimos para operar el negocio Porky's Restaurant en el *Batey Food Court* del centro comercial el *Cantón Mall* en Bayamón, por un tiempo de 3 años comenzando el 1 de junio de 2012 al 30 de junio de 2015. No obstante, sostuvo que, transcurrido ese periodo de tiempo, el contrato continuó vigente por tácita reconducción.

Argumentó, además, que desde el año 2018 adeudan la suma de $26,034.65 por concepto de rentas adicionales vencidas correspondiente a las facturas siguientes: (i) **factura núm. 12210** de $3,787.40 por concepto de diferencia de aumento en la cuota de mantenimiento no facturado de julio de 2016 a marzo de 2018; (ii) **factura núm. 12998** de $1,792.94 por concepto de mantenimiento de áreas comunes del *Cantón Mall* y el *Batey Food Court,* y diferencia de aumento de seguro de noviembre de 2019 a febrero de 2020; (iii) **factura núm. 13108** de $13,103.67 por concepto de la instalación del sistema para *fresh air*; (iv) **factura núm. 13045** de $3,437.82 por concepto de mantenimiento de áreas comunes del *Cantón Mall* y el *Batey Food Court*; (v) **factura núm. 13080** de $3,437.82 por concepto de mantenimiento de áreas comunes del *Cantón Mall* y el *Batey Food Court*; (vi) **factura núm. 001439** de $165.00 por concepto de servicio de destape; (vii) **factura núm. 1816** de $147.50

---

[2] Apéndice del recurso, anejo 1, págs. 1-35.

por concepto de servicio de destape; (viii) **factura núm. 1975** de $162.50 por concepto de servicio de destape. Asimismo, reclamó $2,577.54 por concepto de cargos por demora y $4,500.00 por concepto de honorarios de abogado, ya que ambas partidas estaban estipuladas en el contrato.

Por su parte, los demandados presentaron su *Contestación a demanda y Reconvención[3],* mediante la cual negaron la deuda y alegaron que constituía el cobro de lo indebido. Sostuvieron que el demandante pretendía recuperar: (1) la renta dejada de percibir durante el tiempo que el establecimiento estuvo cerrado a causa de la pandemia del COVID-19, y (2) los gastos incurridos en las reparaciones y mejoras necesarias realizadas al establecimiento para habilitarlo tras el paso del Huracán María. Alegaron que sufrieron daños como consecuencia de los actos del demandante al cobrar lo indebido, lo que les ocasionó gastos de mudanza y pérdidas económicas valoradas en $100,000.00. Particularmente sobre cada factura adujeron lo siguiente: (i) **factura núm. 12210** era un cargo retroactivo y arbitrario; (ii) **factura núm. 12998** no procedía porque se había pagado el 50% y el restante tampoco procedía, ya que el *Cantón Mall* estuvo cerrado del 15 al 31 de marzo de 2020; (iii) **factura núm. 13108** era un cargo arbitrario; (iv) **factura núm. 13045** y **factura núm. 13080** no procedía porque el *Cantón Mall* estuvo cerrado por el COVID-19; (vi) **factura núm. 001439** y **factura núm. 1816** era un cargo arbitrario, ya que la tubería no estuvo tapada.

Tras varios trámites procesales, los demandados presentaron *Moción solicitando permiso para enmendar defensas afirmativas y reconvención para ajustarlas al descubrimiento de prueba.*[4] Sustentaron que advinieron en conocimiento, durante una

---

[3] *Id,* anejo 2, págs. 36-44.
[4] *Id.,* anejo 3, págs. 45-47.

deposición, que el cargo de mantenimiento reflejaba una modificación en el porciento de ocupación establecido en el contrato, cambiándolo de 9.85% a 11.1716%, sin que dicho cambio hubiese sido pactado entre las partes. Es decir, alegaron que no se produjo documento alguno mediante el cual se hubiera modificado el porciento de ocupación de 9.85% pactado originalmente en el contrato. Indicaron, además, que las facturas mensuales notificadas nunca detallaron la forma en que se computaban los cargos por mantenimiento. Por ello, argumentaron que el demandante realizó un aumento ilegal y solicitaron enmendar la reconvención a los efectos de reclamar el reembolso de las cantidades pagadas en exceso.

En desacuerdo, el demandante presentó *Oposición a "Moción solicitando permiso para enmendar defensas afirmativas y reconvención para ajustarlas al descubrimiento de prueba"*, en la cual negó que hubiese aumentado el porciento de área rentable a 11.1716%.[5] Adujo, además, que los demandados tenían la obligación de pagar cualquier aumento en la cuota de mantenimiento en virtud de los Artículos 2.3 y 2.4 del contrato.

Mediante *Orden*, el foro de instancia permitió la enmienda a la contestación de demanda y a la reconvención.[6]

Luego, el demandante instó su *Contestación a reconvención enmendada*.[7] Alegó que la instalación del sistema *fresh air* no era una mejora, sino un requisito de ley que los demandados tenían que cumplir para poder operar su negocio de comida. Además, indicó que tal instalación se realizó con la anuencia y consentimiento de los demandados. En cuanto a las cuotas de mantenimiento, argumentó que estas no constituían una tarifa fija y negó que el

---

[5] *Id.*, anejo 5, págs. 59-62.
[6] *Id.*, anejo 6, pág. 63.
[7] *Id.*, anejo 7, págs. 64-71.

porcentaje de área rentable hubiera sido modificado de 9.85% a 11.1716%. Explicó que, al eliminarse un local del *Batey Food Court*, disminuyó el total de área rentable y aumentó el área de uso común, por lo que incrementó la proporción de los gastos de mantenimiento que correspondía distribuir entre los arrendatarios.

Luego de varios trámites procesales, el foro de instancia celebró el juicio en su fondo durante cuatro (4) días, en el cual comparecieron ambas partes. Allí el foro de instancia admitió como prueba documental siete (7) documentos presentados por el demandante y once (11) documentos presentados por los demandados. Además, el foro de instancia examinó los cuatro (4) testimonios siguientes: (i) el Ing. José Ariel Sánchez Guadalupe; (ii) el Lcdo. Alberto Corretjer Reyes; (iii) el señor Feliciano Landrau y (iv) la señora Feliciano Hernández.

Así las cosas, el foro de instancia emitió *Sentencia*[8] mediante la cual declaró no ha lugar la *Demanda* y ha lugar la *Reconvención* en lo que concierne al cobro de lo indebido. Esto es, el foro de instancia determinó que, mediante la factura núm. 12210, se aplicó un aumento en el porcentaje de área rentable al mantenimiento del *Batey Food Court* del 11.1716%, lo que representó un cargo adicional de $348.34 mensuales desde marzo de 2018 a marzo de 2022 (48 meses), ascendiendo a un total de $16,720.00. Sostuvo que dicho aumento no fue pactado entre las partes, no estaba estipulado en el contrato ni fue notificado oportunamente a los demandados, por lo que constituía un cobro de lo indebido. Asimismo, determinó que la factura núm. 12210 pretendía repetir el cobro de $3,500.00, en contravención con la doctrina de pago *in finiquito*, ya que dicha suma había sido satisfecha mediante 7 pagos correspondiente al periodo comprendido entre julio de 2016 y marzo

---

[8] *Id.*, anejo 20, págs. 1079-1099.

de 2018. Por lo cual, le ordenó al demandante devolver la cantidad de $20,220.00 cobrados en exceso, así como el pago de costas y la suma de $2,000.00 por concepto de honorarios de abogado por temeridad. Además, hizo las determinaciones de hechos siguientes:

1. La compañía demandante, Epifanio Vidal S.E., es una entidad corporativa que se dedica a administrar el Centro Comercial Cantón Mall en el pueblo de Bayamón.

2. El Sr. Gibrán Feliciano Landrau fue el dueño original de un establecimiento comercial tipo restaurante de comida conocido como Porky's, el cual para el año 2022, llevaba operando en el Food Court del Cantón Mall desde aproximadamente 34 años.

[…]

5. En el mes de junio de 2012, se firmó el último Contrato de Arrendamiento existente entre las partes donde compareció la Sra. Normarys Feliciano Landrau como Arrendataria del espacio ocupado en el Food Court por Porky's y donde el Sr. Gibrán Feliciano Landrau compareció como garantizador solidario.

6. El Contrato de Arrendamiento firmado fue preparado por la parte demandante en el año 2012, cercano a la llegada del Lcdo. Alberto Corretjer. La parte demandada no participó en la redacción del contrato

[…]

8. La Cláusula 1.1 del Contrato establece que el arrendatario pagará una Renta Base de $1,200 mensuales y una Renta Adicional variable por concepto de mantenimiento, seguro, publicidad y contribuciones sobre la propiedad. La Renta Adicional por concepto de mantenimiento, a su vez se dividía en 2 conceptos. Una renta de mantenimiento de áreas comunes del centro comercial y otra renta de mantenimiento de área de merendero del Batey Food Court del centro comercial.

9. Según el Contrato, la renta del mantenimiento de áreas comunes del centro comercial se pagaría por el Arrendatario a razón del 9.85% del área rentable (Cláusula 2.3) y la renta de mantenimiento de merendero del Batey Food Court del centro comercial (y sus aumentos), se pagarían a razón del porciento de área rentable de 9.85%, según la fórmula establecida para el local C-1 (Cláusulas 2.4 y 2.5).

[…]

11. En ninguna parte del Contrato se establece un porciento de área rentable variable.

[…]

16. El Contrato de Arrendamiento establece en la Cláusula 2.3 que cualquier aumento en la cuota de mantenimiento o presupuesto, derrama o pago adicional aprobado por la Junta de Co-propietarios conforme el Reglamento será notificado por el ARRENDADOR al ARRENDATARIO y éste último tendrá un término de 10 días para incluirlo en su sistema de pago y pagar el mismo a su vencimiento.

17. Cualquier aumento en el gasto debía ser notificado al Arrendatario, lo cual incluye cualquier aumento en el por ciento de área rentable del local C-1.

18. En ninguna disposición del Contrato se establece que el porciento de área rentable de 9.85% para el local C-1 se modificará o sería variable.

19. Las Facturas mensuales que Epifanio Vidal S.E. enviaba al Sr. Gibrán Feliciano Landrau, durante la totalidad de la relación contractual de 34 años, nunca detallaban la cantidad del gasto original de mantenimiento, al cual se le aplicaba el porciento de área rentable de 9.85%, que el arrendatario estaba obligado a pagar. Las Facturas mensuales establecían la cantidad final, ya computada, bajo la fórmula establecida en la Cláusula 2.3 del Contrato, sin explicar cómo se alcanzaba el monto de la deuda variable de mantenimiento. Siguiendo la anterior dinámica de facturación, los arrendatarios demandados simplemente descansaban en que Epifanio Vidal S.E. les estaba facturando mensualmente el 9.85% estipulado en el Contrato, pero no existía un método que le permitiera al Arrendatario confirmar la aplicación de la fórmula estipulada a base del 9.85% de área rentable.

20. Durante los 34 años de relación existentes entre las partes, nunca se le aplicó al Sr. Gibrán Feliciano Landrau un porciento de área rentable variable y/o distinto al establecido en el contrato. Siempre se le aplicó el porciento estipulado en el Contrato a los gastos de mantenimiento facturados mensualmente.

21. Las partes estipularon un porciento fijo de 9.85% para el rembolso de los dos gastos de mantenimiento.

[…]

24. La compañía JAS Consulting PSC, emitió un Reporte de Observaciones Mecánicas el 25 de mayo de 2018, donde hacen recomendaciones para el restaurante Porky's. La recomendación número 12 del Reporte de Observaciones recomienda instalar un sistema de aire de compensación a la campana (Fresh Air). No se hace recomendación sobre el tipo de equipo, del costo y no se indica nada sobre las razones por las cuales el establecimiento Porky's debía instalar dicho equipo. El Reporte de Observaciones no indica cuál disposición legal específica hace obligatorio el sistema de compensación de aire para un establecimiento con las características físicas particulares del restaurante Porky's.

25. En ningún lugar del Informe de JAS Consulting PSC se establece que se trata de una recomendación obligatoria para poder operar un restaurante con una cocina con pared abierta al salón comedor exterior.

26. Hasta mayo de 2018, los demandados operaron el restaurante Porky's durante más de 30 años en el Cantón Mall de Bayamón, sin que se les requiriera un sistema de aire exterior en la campana (Fresh Air).

27. Las mejoras al sistema de aire acondicionado de Porky's le correspondían implementarlas al Arrendador.

[…]

29. Las partes contratantes no estipularon en el contrato un porciento de ocupación de 11.1716%.[9]

---

[9] *Id.*, págs. 1082-1087.

En desacuerdo, el demandante presentó *Moción solicitando enmienda, determinaciones adicionales de hechos y reconsideración de sentencia.*[10] Particularmente, solicitó la enmienda de la determinación número 21 de la *Sentencia,* a los efectos de establecer que el Artículo 2.4 del *Contrato de Arrendamiento* no dispone que los gastos por concepto de mantenimiento de las áreas comunes del *Batey Food Court* eran a base de un porciento fijo. Sostuvo que dicho artículo le otorgaba derecho a cobrar las sumas correspondientes al mantenimiento de las áreas comunes del *Batey Food Court,* las cuales variaban mensualmente según los gastos incurridos y cantidad de arrendatarios. Adujo, además, que el *Contrato de Arrendamiento* fue novado con el acuerdo de no cobrar la renta mensual. Por lo cual, argumentó que la sentencia tenía un resultado injusto de condenar al demandante a devolver con intereses y sanción con temeridad la suma de $20,200.00 que cobró en concepto de gastos de mantenimiento de las áreas comunes del *Batey Food Court,* ya que no facturó renta mensual por 51 meses. En cuanto a la instalación del sistema de *fresh air,* alegó que erró el foro de instancia al no otorgar credibilidad al Ing. José Ariel Sánchez Guadalupe —respecto a que la calidad del aire constituía un riesgo a la salud y seguridad— basado en que el negocio contaba con los permisos del Departamento de Bomberos y el Departamento de Salud, aun cuando estos no fueron presentados y, por tanto, no podía aplicar la doctrina de legalidad.

Ante esto, el foro de instancia emitió una *Resolución*[11] en la cual denegó la solicitud de enmiendas, determinaciones de hechos adicionales y reconsideración.

---

[10] *Id.*, anejo 21, págs. 1100-1116.
[11] *Id.*, anejo 22, págs. 1117-1119.

Aun inconforme, el demandante acudió ante este Tribunal mediante el recurso de apelación en el cual esbozó los señalamientos de error siguientes:

> ERRÓ EL TPI AL DESESTIMAR LA DEMANDA DE EVSE Y NO CONDENAR A LOS APELADOS AL PAGO DE LAS FACTURAS 11210, 12998, 13108, 13045 Y 13080.
>
> ERRÓ EL TPI AL DECLARAR CON LUGAR LA RECONVENCIÓN DE LOS APELADOS EN CUANTO AL COBRO DE LOS INDEBIDO Y, POR ENDE, DETERMINAR QUE PROCEDE LA DEVOLUCIÓN DEL COBRO DE LOS GASTOS DE MANTENIMIENTO DEL BATEY FOOD COURT PAGADOS.
>
> ERRÓ EL TPI AL NO HACER ENMIENDAS Y DETERMINACIONES ADICIONALES DE HECHOS SOLICITADAS POR EVSE.
>
> ERRÓ EL TPI AL IMPONERLE A EVSE EL PAGO DE COSTAS, INTERESES Y HONORARIOS POR TEMERIDAD.

Por su parte, los apelados presentaron su alegato en oposición. Tras la presentación de la Transcripción de Prueba Oral (en adelante, "TPO"), las partes presentaron sus respectivos alegatos suplementarios.

Así pues, perfeccionado el recurso, procedemos a exponer la normativa jurídica aplicable a las controversias ante nuestra consideración.

**-II-**

**A. Teoría general de contratos**

El contrato nace a la vida jurídica cuando una o varias personas prestan su consentimiento para obligarse a hacer, dar o prestar algo. Artículo 1206 del Código Civil de 1930, 31 LPRA sec. 3371; *Demeter Int'l v. Srio. Hacienda,* 199 DPR 706, 726-727 (2018). Los requisitos para la perfección de un contrato son: (1) consentimiento de los contratantes; (2) objeto cierto, y (3) causa lícita. Artículo 1213 del Código Civil de 1930, 31 LPRA sec. 3391; *Demeter Int'l v. Srio. Hacienda,* supra, pág. 727. Cuando coexisten estos elementos, un contrato es mandatorio en la manera que se

haya celebrado. Artículo 1230 del Código Civil de 1930, 31 LPRA sec. 3451.

En nuestro ordenamiento jurídico, impera el principio de libertad de contratación que le permite a las partes pactar las cláusulas y condiciones que entiendan, siempre que estas no sean contrarias a la ley, moral u orden público. Artículo 1207 del Código Civil de 1930, 31 LPRA sec. 3372; *Betancourt González v. Pastrana Santiago,* 200 DPR 169, 182 (2018). Entonces, los contratos se perfeccionan por el mero consentimiento de las partes, "estas se obligan desde ese momento, no solo al cumplimiento de lo expresamente pactado, sino a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". Artículo 1210 del Código Civil de 1930, 31 LPRA sec. 3375; *Betancourt González v. Pastrana Santiago,* supra.

A tales efectos, existe un principio conocido como *pacta sunt servanda* o la autonomía de la voluntad que supone la obligatoriedad de lo acordado según sus términos y condiciones. *BPPR v. Sucn. Talavera,* 174 DPR 686, 693 (2008). Dicho de otro modo, "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de [estos]". Artículo 1044 del Código Civil de 1930, 31 LPRA sec. 2994; *Demeter Int'l v. Srio. Hacienda,* supra, pág. 727. Como regla general:

> Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.
> Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aqu[e]llas.

Artículo 1233 del Código Civil de 1930, 31 LPRA sec. 3471.

Es decir, la voluntad de las partes tiene más peso que el escrito del contrato cuando este último no es lo suficientemente claro o si no refleja apropiadamente las intenciones de los contratantes.

Discutido el derecho aplicable, este Tribunal se encuentra en posición para resolver las controversias señaladas en el recurso de epígrafe.

**-III-**

En el caso de epígrafe, el apelante esbozó cuatro (4) señalamientos de error. Atenderemos de forma conjunta los primeros dos erros y, de manera individual, los restantes. En el primer y segundo señalamiento de error, el apelante alegó que el foro de instancia incidió al declarar no ha lugar la *Demanda* de epígrafe y al acoger la *Reconvención*, a los efectos de ordenar la devolución de los gastos de mantenimiento del *Batey Food Court* pagados por los apelados y eximir a estos últimos del pago de las facturas núm. 12210, 12998, 13108, 13045 y 13080. Así pues, para simplificar el análisis de las controversias planteadas, procedemos a evaluar cada factura por separado. Veamos.

**A. Factura Núm. 12210**

En primer lugar, la factura núm. 12210 consiste en un cargo retroactivo por mantenimiento no facturado de $3,787.40. Véase, apéndice del recurso de epígrafe, anejo 10, pág. 153. El foro de instancia consideró improcedente dicho cargo, ya que el apelante facturó los gastos de mantenimiento utilizando un por ciento mayor de área rentable al pactado, sin la notificación establecida en el Artículo 2.3 del *Contrato de Arrendamiento*.

De entrada, nos corresponde precisar que, el Artículo 2.3 del *Contrato de Arrendamiento* versa sobre los gastos de mantenimiento de áreas comunes del centro comercial. Véase, apéndice del recurso de epígrafe, anejo 9, pág. 103. En cambio, el Artículo 2.4 del *Contrato de Arrendamiento* trata sobre los gastos de mantenimiento de áreas comunes del *Batey Food Court. Id.*, pág. 104.

Sin embargo, aunque la factura núm. 12210 no especifica a cuál de los dos tipos de mantenimiento corresponde, se desprende

de la TPO que guarda relación con los gastos de mantenimiento del *Batey Food Court*. Nótese que, durante el juicio se le preguntó al Lcdo. Alberto Corretjer Reyes —quien fungía como vicepresidente del apelante[12]—, a qué se refería el "aumento de mantenimiento no facturado" en la factura núm. 12210 y este respondió como sigue: "[c]omo se había eliminado unos espacios y por ende, ahora el mantenimiento se iba a dividir en menos espacios, pues le correspondía pagar un porciento de participación mayor y se le estaba cobrando". En cuanto a la eliminación de los espacios, detalló que se habían eliminado dos locales del *Batey Food Court*, a saber: (i) la Agencia Hípica, la cual no hacía uso de dichas áreas comunes[13], y (ii) la demolición del local C-1-5 con el fin de ampliar el espacio de comedor[14]. En particular, el Lcdo. Alberto Corretjer Reyes explicó que, una vez se dan cuentan de la eliminación de dichos locales

> [...] hici[eron] la aclaración prospectiva y le deja[ron] saber [a los apelados] que como la agencia hípica no se beneficiaba de...de la limpieza del *food court*, por ende, no iba a participar, verdad, y entonces el porciento... el porciento que le correspondía a Porkys por el contrato de limpieza del *food court* aumentaba [...][15]

Así pues, conforme a lo declarado por el Lcdo. Alberto Corretjer Reyes, la factura núm. 12210 comprende un aumento en la proporción de gastos de mantenimiento de las áreas comunes del *Batey Food Court*, generado por la eliminación de dos locales.

A tenor con ello, colegimos que el foro de instancia erró al aplicar la disposición del Artículo 2.3 del *Contrato de Arrendamiento*, pues dicha cláusula regula a los gastos de mantenimiento de áreas comunes del centro comercial. Correspondía, en cambio, la

---

[12] TPO, tomo 1, pág. 102, líneas 21-22.
[13] TPO, tomo 1, pág. 131, líneas 7-14; pág. 144, líneas 16-24; pág. 145, líneas 1-17.
[14] TPO, tomo 1, pág. 139, líneas 4-8; pág. 140, líneas 20-24; pág. 141, líneas 1-13; pág. 277, líneas 4-12. Véase, además, apéndice del recurso de epígrafe, anejo 9, págs. 100-101.
[15] TPO, tomo 1, pág. 145, líneas 9-16 (énfasis en el original).

aplicación del Artículo 2.4 del *Contrato de Arrendamiento,* que atiende específicamente los gastos de mantenimiento de áreas comunes del *Batey Food Court.* Dicho artículo dispone expresamente que tales gastos "quedan sujetos a cambios futuros y retroactivos". Véase, apéndice del recurso de epígrafe, anejo 9, pág. 105. Asimismo, establece que el apelante "podrá aumentar la cuota de mantenimiento del Batey Food Court y tal aumento será obligatorio por el ARRENDATARIO en la proporción que le corresponda". *Id.* Por consiguiente, el apelante contaba con la autoridad contractual para ajustar los cargos de mantenimientos del *Batey Food Court* conforme a la proporción correspondiente, sin que mediara la obligación de notificar previamente dichos cambios a los distintos arrendatarios. Ello es así, en la medida en que nada en la disposición del Artículo 2.4 del *Contrato de Arrendamiento* —a diferencia del Artículo 2.3— impone al apelante el deber de notificar a los arrendatarios los aumentos en la cuota de mantenimiento del *Batey Food Court.*

Por tanto, concluimos que los apelados están obligados a pagar la **factura núm. 12210** de $3,787.40, toda vez que el apelante puede recobrar los gastos de mantenimiento del *Batey Food Court* retroactivamente sin la necesidad de notificar los cambios o ajustes en el porcentaje de participación de cada arrendatario.

### B. Facturas Núm. 12998, 13045 y 13080

En segundo lugar, analizaremos en conjunto las facturas núm. 12998, 13045 y 13080. Estas facturas engloban los gastos siguientes: (i) mantenimiento de áreas comunes del centro comercial, (ii) seguro, (iii) CRIM, (iv) trampa de grasas, (v) servicio de limpieza y recogido, (vi) fumigación, (vii) fumigación de área de comedor, (viii) servicio eléctrico de área de comedor y (ix) mantenimiento de áreas comunes del *Batey Food Court.* Véase, apéndice del recurso de epígrafe, anejo 10, págs. 156-158.  El foro

de instancia concluyó que dichos cargos no procedían, por entender que resultaba aplicable el Artículo 13.5 del *Contrato de Arrendamiento*, al tratarse de una gestión de cobro correspondiente a periodos durante los cuales el centro comercial permaneció cerrado como consecuencia de la pandemia del COVID-19.

En particular, el Artículo 13.5 del *Contrato de Arrendamiento* se titula como "**rebaja de renta**" y dispone como sigue:

> Si el desastre, la reparación o reconstrucción no causados por negligencia del ARRENDATARIO tornaran inutilizable el espacio arrendado, en su totalidad o en parte, se permitirá una **rebaja proporcional de la renta** desde la fecha en que ocurrió el daño hasta la terminación de las reparaciones o reconstrucción [...] Si los daños impiden la operación total, entonces el ARRENDATARIO **no pagará renta**.

Véase, apéndice del recurso de epígrafe, anejo 9, pág. 117 (énfasis suplido).

La controversia en este caso gira en torno a la interpretación del término "renta" en el contexto del Artículo 13.5 del *Contrato de Arrendamiento* y, a partir de ello, a determinar si dicha disposición resulta aplicable. A fin de resolver lo anterior, debemos examinar el lenguaje contractual pactado por las partes.

Surge en el Artículo 2 del *Contrato de Arrendamiento* que, las partes pactaron distintos tipos de renta: (i) la **renta básica o fija**, la cual consiste en el canon de arrendamiento mensual por el espacio comercial número C-1-11 ubicado en el *Batey Food Court*[16]; y (ii) la **renta adicional**, la cual consiste en todos los otros pagos pactados en el contrato como pagos por contribuciones a la propiedad, mantenimiento de áreas comunes del centro comercial[17]. Además, el concepto de renta adicional incluye el pago de mantenimiento del food court, gastos administrativos, operacionales, publicidad, electricidad, limpieza, seguros, remodelación, reparación, seguridad y supervisión de todas las áreas comunes del *Batey Food Court. Id.*

---

[16] Apéndice del recurso de epígrafe, anejo 9, pág. 101-102, artículo 2.1.
[17] Apéndice del recurso de epígrafe, anejo 9, pág. 102-106, artículos 2.2 al 2.5.

Así pues, al realizar un análisis integral texto del *Contrato de Arrendamiento*, colegimos que el término "renta" a la luz del Artículo 13.5, se refiere exclusivamente a su sentido tradicional de renta básica o fija, ya que cuando las partes quisieron aludir a los gastos adicionales —como el mantenimiento de áreas comunes— lo hacen expresamente bajo el término de "renta adicional". En otras palabras, la distinción expresa entre "renta" y "renta adicional" en diversas cláusulas —incluyendo el Artículo 13.5— demuestra que las partes utilizaron dichos términos con significados diferentes y deliberados dentro de la estructura interna del *Contrato de Arrendamiento*. Véase, apéndice del recurso de epígrafe, anejo 9, págs. 101-106, 117, 119-121, 126-127; artículos 2.1 al 2.6, 14.1 15.1, 15.3, 24.1 al 24.2 del *Contrato de Arrendamiento.*

Tal conclusión no solo se sostiene con el análisis integral del *Contrato de Arrendamiento*, sino que además se reafirma con la conducta de las partes. Nótese que, consta en la TPO y en las facturas núm. 12998, 13045 y 13080 que el apelante no estaba cobrando la renta base o fija, sino aquellos gastos pactados en el contrato como "renta adicional".[18]  Esto es, los apelados operaron su restaurante durante varios años sin pagar renta básica o fija, pero sí abonando regularmente a los gastos de mantenimiento de áreas comunes del centro comercial y del *Batey Food Court*. Dicho de otro modo, aunque no pagaban renta base mensual, sí efectuaban el pago de "renta adicional", lo cual quedó consignado en las facturas núm. 12998, 13045 y 13080.

En síntesis, la intención de las partes —manifestada tanto en el texto del *Contrato de Arrendamiento* como en la forma en que este fue ejecutado— fue distinguir claramente entre "renta fija" y "renta adicional". En vista de ello, concluimos que el foro de instancia erró

---

[18] TPO, tomo 1, pág. 96, líneas 12-19. Además, véase, apéndice del recurso, anejo 10, págs. 156-158.

al interpretar que el término "renta", en el contexto del Artículo 13.5 del *Contrato de Arrendamiento,* comprendía ambos conceptos y al aplicar dicha disposición para liberar a los apelados del pago de facturas que solo contienen cargos de renta adicional. En consecuencia, los apelados adeudan y procede que satisfagan el pago de la **factura núm. 12998** de $1,792.94, la **factura núm. 13045** de $3,437.82 y la **factura núm. 13080** de $3,437.82.

### C. Factura Núm. 13108

Por último, la factura núm. 13108 corresponde al cobro de $13,103.67 por la instalación de un sistema de ductos para "fresh air" en el espacio comercial arrendado por los apelados. Se desprende del expediente que, el apelante tuvo que realizar unas reparaciones en el centro comercial debido a los daños causados por el paso del Huracán María por Puerto Rico. Como parte de ese proceso de reparación, contrató a la compañía JAS Consulting PSC, la cual, mediante el ingeniero José Ariel Sánchez Guadalupe, emitió un *Reporte* [de] *Observaciones Mecánicas*[19] en el que se recomendó instalar un sistema de aire de compensación a la campana conocido como "fresh air". En atención a dicha recomendación, el apelante procedió a realizar la instalación y posteriormente recobró a los apelados el gasto ascendiente a $13,103.67.

El foro de instancia determinó que no procedía el cobro de la factura núm. 13108 basado en los fundamentos siguientes: (i) el Ing. José Ariel Sánchez Guadalupe declaró que la cocina del restaurante cuenta con una abertura hacia el mostrar, lo que permite la entrada de aire fresco; (ii) el apelante no demostró que la instalación del "fresh air" fuera un requisito legal obligatorio; (iii) el apelante no estableció cuáles circunstancias hacían mandatario la instalación del sistema "fresh air" después de que el restaurante operara

---

[19] Apéndice del recurso de epígrafe, anejo 10, págs. 129-152.

durante más de 30 años sin dicho mecanismo; (iv) el señor Feliciano Landrau declaró que el restaurante mantuvo vigentes los permisos otorgados anualmente por el Departamento de Bomberos y el Departamento de Salud durante todo el periodo de operación; y (v) el apelante no rebatió la presuncion de legalidad que surge de dichos permisos.

Nótese que, el foro de instancia fundamentó su determinación en la credibilidad que le otorgó a los testigos que tuvo ante sí, cuyas declaraciones pudo ver, oír y percibir de forma directa. Como es sabido, nuestro ordenamiento jurídico invita a que los tribunales apelativos se abstengan de intervenir con la apreciación de la prueba del Tribunal de Primera Instancia, salvo que haya incurrido en error manifiesto, pasión, prejuicio, o parcialidad. Esto se debe a que es el foro de instancia quien está en mejor posición de adjudicarle credibilidad a los testimonios vertidos en el pleito ante su consideración, pues tiene la oportunidad de evaluar el comportamiento de los testigos. En consecuencia, su apreciación merece gran respeto y deferencia.

Respecto a la determinación sobre la factura núm. 13108, debemos otorgar deferencia al foro de instancia en cuanto a la credibilidad que otorgó, toda vez que el apelante no nos ha puesto en posición para determinar lo contrario. Al evaluar la prueba presentada en el presente caso, no observamos que el foro de instancia haya incurrido en error manifiesto, pasión, prejuicio o parcialidad que amerite nuestra intervención. Por el contrario, surge claramente del expediente que, la determinación sobre la factura núm. 13108 está bien fundamentada, el Foro *a quo* tomó en consideración, tanto la prueba testifical como la documental que fue presentada por ambas partes. Ello, lo llevó a adjudicar las controversias ante su consideración de la forma más razonable posible.

Por tanto, tras evaluar los hechos del presente caso, así como el derecho aplicable, concluimos que el foro de instancia no erró al determinar la improcedencia del cobro de la factura núm. 130108 de $13,103.67, correspondiente a la instalación de un sistema de "fresh air".

A continuación, procedemos a atender los últimos dos señalamientos de error esbozados por el apelante.

En cuanto al tercer señalamiento de error, el apelante alegó que el foro de instancia erró al denegar la solicitud de determinaciones de hechos adicionales. No le asiste la razón.

Tras analizar la prueba desfilada en el juicio, así como cada una de las determinaciones de hechos adicionales propuestas por el apelante, colegimos que, aun si fueran adoptadas, el resultado del caso sería el mismo. Ninguna de las determinaciones propuestas modifica en modo alguno la prueba que tuvo ante su consideración el foro de instancia. Además, conviene precisar que, aunque el mecanismo de adoptar determinaciones adicionales de hechos auxilia nuestra función revisora, el foro de instancia no está obligado a acogerlas. Véase, Regla 43.1 de Procedimiento Civil, 32 LPRA Ap. VIII, R. 43.1; *Carattini v. Collazo Syst. Analysis, Inc.* 158 DPR 345, 356 (2003). Este Tribunal revisor evalúa, no solo la corrección de dichas determinaciones, sino también la necesidad de corregir errores y la pertinencia de adoptarlas.

Así pues, habiendo evaluado el expediente de epígrafe, concluimos que el foro de instancia no erró al denegar la solicitud de determinaciones de hechos adicionales. En consecuencia, no se cometió el tercer señalamiento de error.

Finalmente, en cuanto al cuarto señalamiento de error, el apelante sostuvo que el foro de instancia erró imponerle el pago de costas, honorarios de abogados por temeridad e intereses. Le asiste la razón.

La jurisprudencia es clara a los efectos de exigir que una determinación de temeridad sea realizada a base de la conducta disruptiva de la parte sancionada. No podemos olvidar que la imposición de honorarios por temeridad tiene el propósito de penalizar a la parte perdidosa que "por su terquedad, testarudez, obstinación, contumacia, empecinamiento, impertinencia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte a asumir innecesariamente las molestias, los gastos e inconvenientes de un pleito". *Asoc. Salud Primaria y otros v. ELA*, 2025 TSPR 75, 216 DPR ___ (2025) citando a *SLG González-Figueroa v. SLG et al.*, 209 DPR 138, 148-149 (2022).

A la luz de las determinaciones que este Tribunal emite hoy mediante la presente *Sentencia*, queda sustentado que el litigio del caso de epígrafe no fue temerario, pues involucraba una reclamación genuina y compleja que ameritó un análisis jurídico. En ausencia de prueba o indicios de revelen conducta temeraria, el foro primario carecía de facultad para imponer el pago de honorarios.

Por otro lado, dado a que la figura de costas tiene el fin de resarcir a la parte que resulte victoriosa mediante el reembolso de aquellos gastos que se estimen necesarios y razonables para prevalecer en su posición, no procede su imposición en este caso, toda vez que ninguna de las partes prevaleció en su totalidad. Véase, Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1. En virtud de lo expuesto, colegimos que procede dejar sin efecto la imposición de costas y honorarios de abogados.

Advertimos que, lo antes resuelto no descarta la imposición de intereses legales, los cuales son mandatorios en las sentencias que se orden el pago de dinero, como aquí ocurre. Véase, Regla 44.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.3.

**-IV-**

Por los fundamentos antes expuestos, se **modifica** la *Sentencia* apelada para dejar sin efecto las determinaciones relacionadas a las **facturas núm. 12210, 12998, 13045** y **13080**. En su lugar, se ordena que los apelados satisfagan la suma total de $12,455.98 por concepto de la deuda contemplada en las facturas señaladas en la oración precedente. En consecuencia, se deja sin efecto la imposición de costas y honorarios de abogados. Además, se ordena fijar el interés legal prevaleciente en Puerto Rico al momento de emitirse la presente Sentencia, el cual será computado desde la fecha en que esta se dicta y hasta la completa satisfacción de la deuda, conforme a la Regla 44.3 de Procedimiento Civil, *supra.* Así modificada, se **confirma** el resto de la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones